AMANDA CHEEK, ADMINISTRATRIX OF THE ESTATE OF J. H. CHEEK, DECEASED, v. SOUTHERN RAILWAY COMPANY AND J. M. STREET.

(Filed 28 September, 1938.)

1. **Judgments § 32a—Where judgment of nonsuit may be based on either one of two grounds, whether it is res adjudicata as to one of them, quære.**

   Where motion for judgment as of nonsuit is based on the insufficiency of plaintiff's evidence both on the issue of negligence and the issues relating to whether the release introduced by defendant was obtained by fraud or through mutual mistake, and the motion is allowed by general judgment which does not specify on which ground it is based, whether the judgment constitutes *res adjudicata* in a subsequent action on the issues

relating to the release upon substantially identical evidence on those issues, *quære,* since the judgment of nonsuit may have been entered for insufficiency of evidence on the issue of negligence, and the party pleading estoppel by judgment has the burden of establishing the bar.

**2. Cancellation of Instruments §§ 3, 13: Torts § 8b—Mistake must be mutual in order to entitle party to rescission on that ground.**

A release from liability executed by plaintiff may be set aside for mutual mistake, but may not be set aside for unilateral mistake on the part of plaintiff or on the part of defendant, and an instruction that it might be avoided for mistake of either party is error.

BARNHILL, J., concurring in part and dissenting in part.

APPEAL of defendants from *Alley, J.,* at January Term, 1938, of BUNCOMBE. New trial.

This action was brought by Amanda Cheek, administratrix of the estate of J. H. Cheek, deceased, to recover for the injury and death of her intestate, which she alleges was caused by the negligence of the defendants.

Defendants denied the material allegations of the complaint and pleaded a release executed by the deceased a short time after his injury; and the plaintiff replied, pleading mistake and fraud in procurement of the release.

The defendants pleaded that the matters in controversy had become *res adjudicata,* both as to the release and as to the merits of the case, because of a former judgment of involuntary nonsuit rendered in a former case between these parties involving substantially the same evidence.

In support of the plea of *res adjudicata* the defendants introduced the record of the former trial for the purpose of showing that substantially the same evidence was presented by the plaintiff in the first case, both on her allegations of fraud and mistake as to the release, and on the merits relating to negligence and injury.

On the questions of negligence and injury, the plaintiff at this trial introduced additional evidence tending to show that the engineer in the operation of the engine which struck the caboose in which the deceased was standing, thereby causing his injury, had neglected signals to stop and had not kept a proper lookout for the danger.

The defendants introduced the following judgment rendered on a former trial:

"Judgment. This cause coming on to be heard and being heard before the undersigned judge and a jury, and the defendants, and each of them, at the close of plaintiff's evidence, moved for judgment as of nonsuit. Motion was overruled. Whereupon, defendants and plaintiff introduced further evidence and at the close of hearing all the evidence, the defend-

ants and each of them renewed their motion for judgment as of nonsuit. Upon hearing argument of counsel for plaintiff and defendants, and after considering the matter, the court is of the opinion the motion should be sustained. It is therefore ordered and adjudged by the court that the action be and the same is hereby nonsuited and dismissed. (Signed) P. A. McElroy, Judge Presiding."

Plaintiff introduced evidence in support of her contention that the release was procured through fraud and made under a mistake of fact, and the defendants offered evidence to the contrary.

Three issues were submitted to the jury on this phase of the case, the first as to the making of the release, the second as to fraud and misrepresentation, which the jury answered "No," and the third as to mistake. The issue was as follows:

"Did the plaintiff's intestate execute said paper writing by reason of mutual mistake of himself and the defendant Southern Railway Company, as alleged in the reply?"

Upon this issue the judge instructed the jury as follows:

"Where a contract in writing is executed by only one of the parties under mistake as to the facts which is the essence of the contract, the mistake constitutes grounds for a court of equity to rescind and cancel as apparently written, and place the parties in *status quo,* that is, in the former condition. Mistake on either side is ground for rescinding a contract.

"It is a rule that misrepresentations of material facts, although innocently made, if acted on by the other party to his detriment, will cause a sufficient ground for a rescission and cancellation of a contract in equity. The real inquiry is not whether the party making the representations knew it to be false or whether the other party believed it to be true, and was misled by it in making the contract; and whether misrepresentations were made innocently or knowingly, the effect is the same. It is as conclusive a ground for relief in equity as a willful or false assertion, for it operates as a surprise and imposition on the other party; and in such case the party may be held to his representations.

"I charge you if you find by evidence clear, strong, cogent and convincing that at the time the release in question was executed by Mr. Cheek, that either Mr. Cheek or Mr. Cooper, representing the Southern Railway Company, were mistaken about the facts as they then existed with respect to Mr. Cheek's injury, and the nature of it, and the seriousness of it, and you further find by such evidence that they, or either of them, acted on the belief that he was only temporarily, not permanently injured, and you find that the consideration was grossly inadequate, then I charge you, gentlemen of the jury, that that would be such mistake of the facts as is defined by the law which I have just read to you, and

if you so find, by the kind and character of evidence I have defined, that is, gentlemen, by evidence clear, strong, cogent and convincing that the release was signed under a mistake of facts, as I have indicated, it would be your duty to answer the third issue 'Yes.' "

To each of these instructions the defendants excepted.

The jury answered the issue in favor of the plaintiff.

*Edwards & Leatherwood and J. Y. Jordan, Jr., for plaintiff, appellee.*
*W. T. Joyner and Jones, Ward & Jones for defendants, appellants.*

SEAWELL, J. 1. We do not think the present state of the record has placed the Court in a position to rule on the question of *res adjudicata* as applied to the release claimed to be effected by the involuntary nonsuit on the evidence in the first case.

If we assume that a substantial identity exists between the evidence on the first trial and that in the case at bar on this question, we are met with the difficulty that the judgment of involuntary nonsuit in the first trial is general in its character and does not specify any particular phase of the case to which it applied. That case was subject to nonsuit if the plaintiff failed to establish her contention of fraud or mistake by evidence sufficient to avoid the release, and equally so upon her failure to produce evidence sufficient to go to the jury on the question of negligence, injury, and damage. There was a further suggestion that the complaint in the first case was defective in not properly setting out facts as to the dependents of deceased and that the evidence in that respect was not addressed to an adequate declaration in the complaint.

While ordinarily a judgment under review may be sustained on any ground legally justifying it, even though the judgment itself may be predicated on a different ground, it is questionable, at least, whether this rule can be applied to a judgment in a former suit pleaded as *res adjudicata,* where the burden is on the pleader to bring itself within its terms. We do not pass upon this matter but refer to it in order that it may be understood that it has not escaped the attention of the Court.

2. On the trial, the question of fraud and misrepresentation was submitted under an appropriate issue, thus segregating that phase of the case and its pertinent evidence. The third issue related to mistake alone and was framed to present the question of *mutual* mistake.

On this issue, in the above excerpts from the charge the judge instructed the jury that the release could be avoided "by mistake of either party"—that is, by mistake of either the party seeking to avoid it or the party seeking to enforce it. This statement is so broad, and so untenable, as to suggest inadvertence.

---

---

A contract is the product of two or more consenting minds making a commitment about the same thing, binding on the parties at law or in equity. It is true that where there has been no meeting of the minds on the essentials of the treaty, no contract results. *Lumber Co. v. Boushall,* 168 N. C., 501, 84 S. E., 800. But if we can conceive of such a situation—or, indeed, of a case of "innocent misrepresentation"—that cannot be resolvable into mutual mistake (*Great Northern R. Co. v. Fowler,* 136 F., 118, 69 C. C. A., 106.; *Seymour v. Chicago & N. W. Ry. Co.,* 181 Ia., 218, 164 N. W., 352, 357; Williston on Contracts, Rev. Ed., section 1551, and notes), still we can find no authority for the rescission of a contract for mistake at the instance of a party who has made no mistake.

If we confine the allusions in the instruction to the plaintiff seeking relief from his own mistake, it is still contrary to established precedent. This Court has not adopted the doctrine that an unilateral mistake—or mistake alone of the party seeking to avoid the contract—unaccompanied by fraud, imposition, undue influence, or like circumstances of oppression, is sufficient to avoid a contract. We do not undertake to catalogue the conditions which will give rise to equity jurisdiction. We simply say that the mere mistake of one party alone is not sufficient to avoid the contract. *Bean v. R. R.,* 107 N. C., 731, 747, 12 S. E., 600. To have that effect, the mistake must be mutual. *Ebbs v. Trust Co.,* 199 N. C., 242, 153 S. E., 858; *Hinsdale v. Phillips,* 199 N. C., 563, 572, 155 S. E., 238; *West v. R. R.,* 151 N. C., 231, 236, 65 S. E., 579; *White v. R. R.,* 110 N. C., 456, 461, 15 S. E., 197.

As we have seen, the issue submitted to the jury raises only the question of mutual mistake. The instructions given are not pertinent to such an inquiry, and as statements of law on the subject given the jury to consider they cannot be approved.

Other exceptions need not be considered.

For the errors noted, the defendants are granted a new trial.

New trial.

BARNHILL, J., dissenting: I concur in the conclusion of the majority opinion that there was error in the charge of the court below, which, in any event, entitles the defendants to a new trial. But I am of the opinion that the defendants' motion to dismiss as of nonsuit, made at the conclusion of all the evidence, should have been allowed for the reason that there is no evidence tending to show that the death of plaintiff's intestate proximately resulted from the injuries received by him while engaged in his work as an employee of the defendant Railway Company. The award of a new trial impliedly overrules defendants' exceptive assignment of error directed to the denial of the motion to nonsuit in the court below. As to this I am compelled to differ with my brethren.

There is evidence of negligence resulting in injury to the deceased. This is not sufficient to justify a recovery for the wrongful death of the deceased. There must be some evidence that the injuries received proximately caused the death.

On the first hearing the plaintiff tendered as witnesses the doctor who attended the deceased following his injuries and also the physician who made a *post-mortem* examination, and another doctor who examined him while he was suffering from his injuries. On the second hearing the plaintiff elected not to examine these doctors in her behalf, but instead tendered, as an expert witness, a physician who never saw the deceased. This witness was asked a hypothetical question which assumed the existence of all the facts and circumstances relied upon by the plaintiff, including the circumstances of the injury, his confinement in the hospital, the physical evidences of injury, such as swelling over his left chest and a spot which became discolored and remained discolored for some two weeks, his loss of time from his work, his loss of weight, his complaints about pain in his left chest, the circumstances of his sudden death and his physical appearance prior to the injury which showed no outward evidence of any disease. In answer to this question this witness testified: "I think that the blow might have accelerated his death." He further testified that if he had been present at the *post-mortem* examination and had found a highly enlarged heart approximately twice its normal size his diagnosis most likely would have been that the deceased died from heart trouble. This is the only evidence of proximate cause offered by the plaintiff.

The defendant offered the doctor who attended deceased during the time he was in the hospital and immediately thereafter, who, after describing the injuries and his treatment, testified: "In my professional opinion as an expert I do not think any injury which I found on Mr. Cheek when he was in the hospital, or any he received which caused him to go to the hospital on the 20th day of July, was sufficient to produce or cause death." Dr. Smith testified that he saw the deceased in the hospital and that: "In my opinion I cannot say that I found anything from the bruises that I saw and the examination that I made that would indicate that any injury received was either total or permanent. . . . The blue spot that was on Mr. Cheek's chest, or the blow, or whatever caused it, in my opinion was not of sufficient force to in anywise affect the heart or arteries. I think that it was a superficial wound, because after we got inside his chest cavity (this witness was present at the autopsy) there was no damage done to the chest wall. It was superficial. It was the heart that caused his death. In order for a lick to be of sufficient force to damage the heart it would also do damage to the chest wall. . . . The cause of death was a dilation of the heart and generalized arteriosclerosis."

CHEEK *v.* R. R.

Dr. Crump, who performed the autopsy and made the *post-mortem* examination, testified that he found a condition of hypertrophy, or an enlargement of the heart muscles and dilation and stretching of the chambers of the heart, which was in his opinion the cause of death; that the heart was dilated like an inflated balloon; that there was a hardening of the arteries generalized throughout the body, and including the arteries that supply the heart muscles and brain; that he found adhesions over the surface of the lungs, indicating inflammatory condition or pleurisy some time prior thereto; inflammatory condition of the gall bladder with gall stones, and inflammation of the prostate gland. In response to a hypothetical question on cross-examination, which question assumed all the facts and circumstances favorable to the plaintiff, he testified: "Under those circumstances the injury could have something to do with his death and, also, could have absolutely nothing to do with his death." He likewise testified that he found no evidence of injury to the walls of the chest.

This evidence offered by the defendant does not impeach or contradict the evidence offered by the plaintiff. It serves merely to amplify and explain plaintiff's testimony. It is, therefore, permissible and proper to consider it on a motion of nonsuit. *Hare v. Weil,* 213 N. C., 484, and cases there cited.

Whether we consider this medical testimony offered by the plaintiff and the defendants as a whole, or only consider the testimony of the plaintiff's expert witnesses, it appears that all that the plaintiff has been able to show is that there is a possibility that the death of the deceased was hastened or accelerated by the injuries to her intestate. This is not sufficient. There must be some substantive testimony that the injury received was the proximate cause of the death of the deceased before the plaintiff is entitled to have the cause submitted to a jury. She has been unable even to show that such injury probably contributed to the death of her intestate. All the evidence amounts to conjecture and the jury was left to surmise and guess at the cause of death, if they refused to accept the positive testimony that it was caused by a heart ailment. This is not sufficient. *Gower v. Davidian,* 212 N. C., 172. We permit the jury to say that the injuries proximately caused the death when the witness offered by plaintiff to show that particular fact is unwilling to say that there is any causal connection.

Plaintiff's intestate received his injuries 20 July, 1934. He returned to his work approximately one month thereafter and worked with reasonable regularity for a period of about four months before his death. During this time he was suffering from symptoms which are attendant upon and which are commonly recognized as indicative of heart trouble, and died suddenly under circumstances which the physicians say clearly

indicate death from heart failure.    And yet, the jury finds that his death proximately resulted from injuries received five months prior thereto.

I am convinced that on the present record defendants are entitled to a judgment of involuntary nonsuit on the cause of action for wrongful death.    This, however, does not bar recovery for the injuries received. The cause of action for such injuries survives under the Federal law. See *Railway Co. v. Craft,* 237 U. S., 648, 59 L. Ed., 1160.